IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

**HEIDI ANDERSON,** both individually
and as legal guardian of:

**M. S. A.**

and

**E. G. A.,**

Minor children,

    Plaintiffs,

    vs.

**DR. MARK HANSEN,** in his official
capacity as Superintendent of the School
District of Elmbrook,

**ELMBROOK SCHOOL DISTRICT,** a
Wisconsin local public school authority,

    Defendants.

Case No. 20-cv-1305

Jury Trial Demanded

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND
MONETARY DAMAGES**

**Introduction**

1. This case concerns three separate but linked series of actions in which Defendants
   used a variety of illegal and tortious tactics to suppress Plaintiff Heidi Anderson's
   right to freedom of speech, right to vote, rights as a parent of both minor plaintiffs,

due process rights, and right to equal protection. Defendants' actions were part of a larger pattern of viewpoint discrimination in violation of Defendant's duties under the First Amendment to the United States Constitution.

## Parties

2. Plaintiff Heidi Anderson is a natural person and legal resident of Waukesha County, Wisconsin. Anderson is also a natural parent and legal guardian to both minor children listed below.

3. M. S. A. is a natural person and minor child who is enrolled at and attends school within the Elmbrook School District, at this high school level.

4. E. G. A. is a natural person and minor child who is enrolled at and attends school within the Elmbrook School District, at the middle school level.

5. Defendant Mark Hansen is a natural person employed as Superintendent of the Elmbrook School District.

6. The School District of Elmbrook is a taxpayer-funded municipal public school district serving the municipalities of Brookfield, New Berlin, and Elm Grove, Wisconsin.

7. Originally organized as Elmbrook Joint Common School District No. 21, it is also known as Elmbrook Schools and Elmbrook School District.

2

8. By its own published accounting, Elmbrook School District serves approximately 7,400 students and their families.

9. Elmbrook School District is governed by a Board of Education as required by Wisconsin state law. Elmbrook's Board of Education consists of seven members who are elected by local voters, or in the case of an interim vacancy, appointed following an application and vote of the Board of Education.

## Jurisdiction and Venue

10. This Court retains jurisdiction over the case and controversy as all parties legally reside or operate within Waukesha County, Wisconsin, within the bounds of the Eastern District of Wisconsin, and are subject to service therein.

11. The Court retains subject matter jurisdiction under 28 U.S.C. §1331 (federal question jurisdiction), as this case arises under 42 U.S.C. §1983 and the First Amendment to the U.S. Constitution, as well as supplemental jurisdiction of any state law claims under 28 U.S.C. §1367.

12. Venue is proper in the Eastern District of Wisconsin as all parties reside or operate therein, and the factual allegations necessitating the filing of this Complaint occurred entirely, or nearly entirely, within the bounds of Waukesha County, Wisconsin, within the boundaries of the Eastern District of Wisconsin.

3

## Factual Allegations Supporting Claim for Relief

13. Plaintiff Heidi Anderson is the mother of two children who attend schools in the Elmbrook School District and lives within its boundaries.

14. Mrs. Anderson is a practicing Christian and active civically in her community.

15. Due in large part to her faith and civic perspective, Mrs. Anderson generally opposes mandatory mask mandates, believing that the wearing of a mask in the public sphere should be a personal choice, or at least subject to exemptions for medical or religious reasons in similar fashion to vaccinations and other common medical treatments and prophylactic public health measures.

16. In addition, both Mrs. Anderson and one of her minor daughters suffer from respiratory illnesses that make prolonged use of a facemask unusually difficult and potentially hazardous to their health.

17. Elmbrook Schools, like all Wisconsin school districts, has faced the need to adapt its school operations and protocols to deal with the COVID-19 pandemic.

18. As part of this adaptation, a variety of measures have been put in place of varying degrees of cost and controversy.

19. A mandate that all students attending in person wear masks was one of the measures proposed for full consideration at Elmbrook's Board of Education meeting on August 11, 2020.

4

*The Board Meeting of August 11, 2020*

20. Mrs. Anderson attended the Elmbrook Board of Education meeting on August 11 both to listen and to speak out regarding her concerns and opposition to the mask mandate and related policy actions under consideration.

21. The Board of Education meeting was held at the Elmbrook District Office, at 3555 North Calhoun Road, a public building in Brookfield, Wisconsin.

22. In person attendance was limited due to social distancing, but live streaming of the meeting was provided. To Plaintiff Anderson's knowledge it was watched by approximately 1,500 viewers.

23. The meeting offered two different means for citizens to participate as speakers:

    a. The first is a general open comment period for citizens to raise issues or give statements. It is not tied to any particular agenda or policy items.

    b. The second is the ability to sign up to comment or speak regarding a specific agenda item or policy issue on the Board's agenda.

24. Mrs. Anderson was successful in signing up for the second option.

*First acts showing Defendants' intent to engage in Viewpoint Discrimination*

25. Another local citizen attempted to attend the meeting and speak but was not successful. Like Mrs. Anderson, this citizen is a mother, but is also active in a grassroots organization called Wisconsinites Against Mandatory Masks.

26. Wisconsinites Against Mandatory Masks opposes mask mandates along similar lines to the views held by Mrs. Anderson.

27. After entering the meeting area and signing up to speak in opposition to the mask policy, this citizen was confronted by an Elmbrook official (possibly Dr. Hansen himself).

28. The Elmbrook official informed her that; (1) she would not be allowed to speak, (2) she must leave the premises immediately, and (3) failure to leave would result in calling the police to have her removed or presumably arrested for an unspecified offense.

29. To Plaintiff Anderson's knowledge, this citizen was under no legal disability or order precluding her from having a right to attend and speak.

30. The excluded citizen did not appear to have caused, or demonstrated an intention to cause, any disruption or danger to the meeting, nor did she appear to be engaged in any illegal activity or provide any other provocation for her forced removal except for her intention to speak in opposition to the mask proposal being made by Defendant Hansen.

*Mrs. Anderson's Citizen Comments*

31. Unlike the citizen referenced above, Mrs. Anderson was not prevented from speaking, but following her citizen comments (discussed in detail below),

6

Defendant Hansen has banned her from all Elmbrook properties, censored portions of her citizen comments from the publicly available video of the meeting (without any annotation or notice to viewers), and put out a "District Response" statement condemning her comments and viewpoint.

32. No allegation has been made that any action(s) or conduct by Anderson, other than the content of her speech, were a factor in the Defendants' ban, censorship, or public condemnation of her.

33. During her entire comment period, Plaintiff Anderson spoke from the podium provided for the purpose. She has not been accused of making any improper gestures or taking any physical actions whatsoever other than standing at the podium and speaking normally.

34. At no time did Mrs. Anderson do anything notable other than engage in topical protected speech within a designated public forum.

35. Plaintiff Anderson did exceed her allotted time for her comments. However:

    c. No document, communication, or statement from Defendant Hansen or Elmbrook Schools has ever indicated any relationship whatsoever between Anderson going over time and any of the further actions against her discussed below, and

    d. To Anderson's knowledge, a citizen exceeding the intended time limit at a Board of Education meeting is not uncommon and has never resulted in

censorship, public condemnation, or a ban from all District properties for
the offending citizen,

36. After concluding her remarks, Anderson voluntarily left the podium and took her
seat while the meeting's chair, Board President Scott Wheeler, said "thank you."
He then called up the next citizen speaker without any apparent disruption or
delay, and without any other reference or expression from anyone regarding Mrs.
Anderson's comments.

*The content of Plaintiff Anderson's speech*

37. Mrs. Anderson's comments were addressed toward concerns and criticisms of the
District's COVID-19 reopening plan. A transcript of her full comments is attached
to this Complaint as Exhibit 1.

38. As can be verified from the transcript and video record of the meeting, at no time
did Anderson's remarks include any threat or solicitation of violence, any
confidential or privileged information, any fighting words or verbal invective, any
obscenity, any vulgarity, or even any significant material not topical to the matter
under consideration.

39. What Plaintiff's remarks did include were conclusions, beliefs, and opinions that
are open to debate (though apparently not in the Elmbrook School District as
Defendant Hansen chooses to operate it) and disfavored by Defendant Hansen.

8

*Plaintiff Anderson's Criticism of the District's proposed medical liaison.*

40. Notably, Plaintiff also focused (briefly and late in her remarks) on criticism directed to the planned appointment of a single board member, Dr. Mushir Hassan, as a special medical liaison to guide the District's implementation and evolution of measures such as mandatory masks.

41. Plaintiff was, and remains, concerned that this appointment would cause Dr. Hassan's perspective on masks, which is opposed to Mrs. Anderson's, to be the sole perspective given weight or heard by the District leadership.

42. Beginning this brief section of remarks by arguing that Dr. Hassan was not the right person to be the board liaison, Plaintiff confined her criticism explicitly to his suitability for this special role and his ability to represent Anderson's perspective as a constituent while performing it.

43. As part of this criticism, Anderson noted Dr. Hassan's medical background as in internist rather than a virologist or epidemiologist, which she opined did not impart the level of exclusive expertise implied, and relied upon, by the District's proposal.

44. Anderson then raised the following concerns that she perceives may limit Dr. Hassan's objectivity in this unique role:

a. Dr. Hassan's employment with Ascension health (an extremely large and powerful health care organization whose financial interests, in her perception, could impact its positions or actions relating to COVID-19).

b. His political stances strongly criticizing President Trump and conservatives (who are far more commonly of Mrs. Anderson's views regarding masks) and his partisan support of President Obama and Democrats (who tend to be significantly more supportive of mandatory mask requirements).

c. His leadership in the local Muslim community (discussed in more detail below).

45. While Plaintiff Anderson briefly raised the issue of Dr. Hassan's faith, at no time did she state or imply that Dr. Hassan's status as a practicing Muslim rendered him unfit in any way to serve as a board member, made him inferior to her or any other Christian, should subject him to any condemnation or limitation as a citizen, or was objectively or morally wrong.

46. Instead Plaintiff Anderson noted the differences she perceives between Christian and Muslim practices in their perspectives on face or head coverings (particularly for females such as her daughters).

47. Mrs. Anderson's perception of this distinction was generalized rather than nuanced, but is far from false. The Qur'an's guidance on modesty references

specific use of veils or barriers (*khumur* and *hijab*) as part of a woman's practice of her faith. *See for example*, Qur'an 24:31 (*Surah An-Nur*).

48. As such, many Muslim women choose to wear various types of head and neck coverings in public or in the presence of men who are not part of their family, and some women cover much of their face with a covering such as a *niqab*.

49. While certainly many dictates of Christian practice, or those of other religions, also guide those of faith to remain modest and decent, the use of the hijab or niqab is a distinct and important core principal of Muslim faith for those who adhere to it.

50. This status is effectively undisputed, allowing the use of religious coverings by practicing Muslims to be both recognized and protected from discrimination under federal law as part of the free exercise of religion guaranteed by the United States Constitution.

51. Plaintiff at no time stated that the wearing of head or face coverings was inappropriate in any way for Muslims, but did state she did not believe it was any more appropriate a requirement for Christian children than it would be to subject a Muslim child to a practice inconsistent with her faith (such as a mandate to uncover by wearing more sexualized, immodest dress).

52. Plaintiff was, and remains, concerned that a diversity of pertinent religious perspectives is required when evaluating mask regulations, so that one faith's perspective on face coverings does not predominate over others.

53. Following Anderson's speech, Elmbrook's Board of Education approved the proposal Hansen offered to reopen with a mask mandate for students who attend in person, and with the option of virtual instruction for families who do not wish to risk in person attendance or comply with the mask mandate.

54. Some of Anderson's comments produced backlash on internet social media, where some commenters perceived them as a personal attack on Dr. Hassan or as being Islamophobic.

55. In response to this backlash, Defendant Hansen became concerned over the impact of the comments and backlash on the prestigious reputation of the Elmbrook School District.

56. On its website, Elmbrook prominently bills itself as "a top tier public school district," and a "destination district, attracting families from around the world and talented employees from across the region."

57. The website further demonstrates the importance of this prestige to Hansen and his staff, by admitting "we work tirelessly to earn our reputation as one of the best school districts in Wisconsin."

58. In addition to this reputation concern, Plaintiff has since become aware of evidence that a specific concern involving Dr. Hassan's vacancy appointment to the Board of Education may play a role in Defendant Hansen's reaction to her criticism.

59. Plaintiff was unaware of this on August 11, and has not publicly commented on it, but a controversy has been progressing as to the process by which Dr. Hassan was appointed to Elmbrook's Board to fill an interim vacancy in May 2020. He was appointed to the exclusion of other applicants without performing with required public vote.

60. These concerns have been significant enough that Elmbrook Schools was sued in state court in June 2020 over its failure to provide public records relating to Dr. Hassan's irregular appointment process.

61. Superintendent Hansen's response to this perceived threat to reputation and possibly the perceived (though unintentional and inadvertent) threat to the District's ongoing efforts to quiet the controversy surrounding the appointment, took three forms:

    a. First, Hansen directed or allowed the placement of a "District Response" on Elmbrook's website and the sending of the same response via electronic mail to a mailing list of well in excess of 7,000 people.

    b. Second, as announced in the response, he chose to censor part of Anderson's speech from the District's archived video of the meeting.

    c. Third, he drafted and served an official letter to Plaintiff Anderson known colloquially as a "trespass warning." This letter effects a ban on Anderson being present on any Elmbrook property for the duration of her life.

13

62. The "District Response to Citizen's Comments" sent out at Hansen's direction or with his approval, is attached to this Complaint at Exhibit 2, and is addressed to the entire "Elmbrook Schools Community."

63. The Response accuses Plaintiff Anderson of "targeted and defamatory speech," implied that said speech was purportedly "designed to create chasms between those in our community," and called her remarks "deplorable."

64. The Response includes several false or misleading statements, including, but not necessarily limited to:

   a. Billing itself as the Elmbrook School District's response and carrying the byline of the Board's President and Vice-President, when in reality it had not been discussed or approved by the Board of Education.

   b. Using the legal term "defamatory" to describe Anderson's speech criticizing Dr. Hassan's role in the mask proposal, despite that speech not meeting the legal requirements to be considered defamation.

   c. Repeatedly using terms describing physical actions rather than speech to refer to Anderson and her comments, so as to mislead the reader into believing that she might have engaged in "unseemly behavior," when in reality the sole issue was the viewpoint or content of what she said.

65. The "District Response" was proactively disseminated as widely as the District was able electronically. Based on evidence currently available to her, Plaintiff Anderson understands it was sent directly to in excess of 7,000 recipients, including most or all school families in the community, even some who no longer had students enrolled in the District. And it was placed on social media prominently so as to be communicated to numerous people throughout the United States.

66. This distribution is massively in excess of the roughly 1,500 who watched the meeting or the approximately dozens of commenters creating the initial backlash itself.

67. This distribution, combined with the grossly reactionary language and misleading content of the Response itself, carries the effect of escalating any actual divisiveness or disruption caused by Plaintiff's remarks rather than mitigating it.

68. Mrs. Anderson and her daughters have both observed and experienced this escalating effect, as criticism of Anderson's actual comments has since been dwarfed by hateful backlash based upon, or encouraged by, the "District's Response."

69. The above also has the effect of punishing Plaintiff Anderson for her viewpoint and protected speech by deliberately targeting her and her minor daughters for increased public condemnation, hate, and emotional distress.

70. The defamatory and punitive aspects of the "District's Response" could have been mitigated somewhat had Hansen not also simultaneous censored Plaintiff Anderson's comments from the publicly available video. This meant that readers of the "District's Response" were not able to see what had actually happened (and *not* happened) at the meeting.

71. The District's combination of a widely broadcast misleading condemnation and the act of censoring the material that could allow a reader to discover its misleading content, is what ultimately maximized the punitive and defamatory impact on the Anderson family.

72. Hansen's decision to censor the Board's public video record was done without Board approval or any public notice or discussion.

73. Later, when Mrs. Anderson commented on the District's Facebook post to attempt to call attention to the misleading condemnation, Hansen and/or his staff removed the comments in a second act of viewpoint censorship.

74. Comments in support of the District or Dr. Hassan have not been removed, even when they include defamatory material, such as a false accusation claiming that Anderson had called Dr. Hassan a Satan worshiper.

75. With Hansen's censorship in place, the bogus Satan worshipper allegation is much easier to spread without readers discovering its falsehood.

16

76. In order, by his own admission, to "make [the District's] position crystal clear" (in other words, to ensure or enhance the relative favor and disfavor of his speech versus Anderson's) Hansen drafted and formally served a "trespass warning" letter on Anderson on August 13, 2020.

77. This letter is attached as Exhibit 3. It states, *inter alia*:

    d. "You are hereby advised that effective immediately, you are not allowed on any District property or to be present in any District facility without the prior approval of myself, as Superintendent of the District or the principal of the school where your children attend school."

    e. Should Mrs. Anderson fail to secure this permission and come onto any Elmbrook property or facility, the District "will enlist the assistance of local law enforcement in having you removed from District property for trespassing," and "will take all legal action available to it including, but not limited to, filing a criminal complaint against you should you violate these directives."

78. This letter was also copied to the Chief of Police for the City of Brookfield, in which Anderson and her family live.

79. Like the "District's Response" it contains false or misleading information that has now resultantly been communicated specifically to the local police with jurisdiction over Anderson and her family.

*Impact of the Unconstitutional Ban*

80. The ban substantially limits the normal family activities and public community participation of Anderson and her daughters, and has no sunset other than the *de facto* one provided by Mrs. Anderson's eventual mortality.

81. This punitive effect is both clear and significant, requiring Plaintiff Anderson to seek and secure permission of Hansen or his designees before something as basic as picking up a child from school or attending a child's sporting event.

82. This punitive effect infringes on Anderson's rights as a citizen and parent, but also on her daughters' rights to equitable treatment from their schools.

83. Both daughters were compelled to opt for virtual instruction (which Plaintiffs consider to be substandard to traditional instruction) based partially on the restrictions and stigma the ban creates. The other factor in this decision is the present lack of any exemption policy for the mask mandate.

84. In addition, Plaintiff Anderson is a registered voter, and her polling place is Burleigh Elementary School, an Elmbrook Schools property from which she is now banned.

85. Due entirely to Defendant Hansen's actions, Anderson is now unable to cast an in-person vote in the general election in November 2020 without risking the explicit and imminent threat of arrest and prosecution.

86. While this would not preclude her from casting a mail-in/absentee vote, Plaintiff Anderson does not wish to waive her legal right to cast her ballot at her polling place. She finds the mail in process significantly less reliable and trustworthy since she cannot timely verify whether her ballot has been received, accepted, or counted—all of which she can observe directly when voting in person.

87. As a civically active citizen, Anderson and her family also consider their children's first electoral participation to be an important right of passage.

88. Plaintiff's elder daughter, M. S. A., will cast her first general election ballot this November. Plaintiff has long planned to accompany her to ease any apprehension of, as well as celebrate, her daughter's first trip to the polls. Defendant Hansen's order criminalizes this simple and imminently American familial act.

89. Finally, the ban effects a prior restraint on further criticism of Hansen's actions, proposals, or policy viewpoints as Elmbrook's Superintendent. Plaintiff Anderson is now barred from doing exactly what can be done by essentially every other local citizen except for some registered sex offenders—to come to a public meeting of a government body of which she is a constituent, and voice her concerns to those who hold enormous power over her family's future.

## Causes of Action and Prayer for Relief

90. Defendant Hansen and his District have engaged in clear viewpoint discrimination against Plaintiff Anderson in violation of her right to freedom of speech guaranteed by the First Amendment to the United States Constitution.

91. This viewpoint discrimination includes, but is not necessarily limited to:

    a. Direct censorship of Anderson's speech.

    b. Direct and proximate punishment of Anderson and her family for her exercise of protected speech.

    c. Indirect punishment for this speech via the use of electronic communications, social media, and further selective censorship to bring and enhance emotional distress to Anderson and her family.

    d. Prior restraint on Anderson's speech.

92. This viewpoint discrimination has been accomplished entirely within Defendant Hansen's role as Superintendent of Elmbrook under color of the legal authority conferred thereby.

93. As such, it creates an actionable cause under 42 U.S.C. §1983 for the deprivation of civil rights.

94. In addition, such cause is also actionable for Defendants' interference with Plaintiff Anderson's right of suffrage, a right ironically secured for her exactly 100 years ago this month.

*State Law claims reserved*

95. Plaintiff Anderson notes that Defendants' conduct is also actionable under Wisconsin state tort law, including, but not necessarily limited to, the torts of defamation, intentional infliction of emotional distress, and various state law protections mirroring federal law on free speech, voting rights, and parental rights.

96. Plaintiff Anderson hereby gives notice of her intention to consolidate these tort claims in the present action under supplemental jurisdiction. This is not done in this Complaint, but will be done via a supplemental pleading because it cannot be heard procedurally until the end of the Wisconsin Government Tort Claims Act notice period, assuming that the parties do not reach a resolution in the interim.

*Responsibility of Defendants*

97. Defendant Hansen is responsible for these violations via his direct commission of them or explicit authorization of them.

98. Defendant Elmbrook shares responsibility for these violations by employing all the officials, staff and officers who have participated in them, coupled with either knowingly authorizing these violations, or in the alternative, failing to adequately supervise, train, or restrain those who committed and authorized them.

21

99. To the knowledge of Plaintiff Anderson, all the conduct discussed above was committed by Superintendent Hansen and other Elmbrook employees while acting in the course of their employment.

*Prayer for Relief*

100.     Plaintiffs therefore request this Court grant the following relief:

a. Issue a permanent injunctive order barring Hansen, Elmbrook, and its officers or agents from maintaining and enforcing their lifetime ban of Plaintiff Anderson from school properties.

b. Issue a permanent injunctive order barring Hansen, Elmbrook, and its officers or agents from continuing to engage in any improper censorship, defamation, prior restraints, punishment for speech, or any other acts of viewpoint discrimination.

c. Issue a permanent injunctive order barring Hansen, Elmbrook, and its officers or agents from restricting future in-person enrollment, failing to allow timely changes in that enrollment, or otherwise penalizing Plaintiff Anderson's daughters.

d. Grant Plaintiff Anderson and her minor daughters a judgment for monetary damages in an amount to be determined by the Court and based on compensatory damages for (1) all Plaintiffs' emotional injury and distress, (2) Plaintiff Anderson's loss of reputation and damage to her

future employability and earning capacity, and (3) other monetary loss or damages found proper and compensable by the Court.

e. Grant Plaintiff a judgment for attorney's fees and costs required for the filing and prosecution of this case; and/or

f. Grant whatever additional relief the Court deems just and proper to bring about cessation of the violations or hold Defendants accountable for them.

101. Plaintiff Anderson reserves the right to supplement or amend this pleading as appropriate to conform to additional or subsequently discovered information.

Respectfully submitted,
__s/ Brady R. Henderson___
Brady R. Henderson, Wis. Bar #1116435, Okla. Bar #21212
Cream City Law, LLC
5150 N Port Washington Rd., Suite 210
Milwaukee, WI 53217
(414) 563-7453
brady@creamcity.law